UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MICHAEL THOMAS,
    Plaintiff,

vs.	04-1321

DR. ARTHUR FUNK, et. al.,
    Defendants.

<u>ORDER</u>.

This cause is before the court for consideration of the defendants' motions for summary judgement. [d/e 111, 113]

## I. BACKGROUND

The plaintiff, Michael Thomas, originally brought this action pursuant to 42 U.S.C. §1983 alleging that his constitutional rights were violated at the Pontiac Correctional Center. The plaintiff's surviving defendants including Dr. Arthur Funk; Dr. Suresh Vade; Medical Director Vuksan Bulatovic; Warden Stephen Mote; Medical Technician Richard Joyal; Correctional Officers Christian Paul, Leo Smith, James Livingston and Shane Hendrickson; Counselor Wesley Wiles; Grievance Officer Terri Kennedy; Lieutenants Patrick Hobart and Cletus Shaw.   The plaintiff has the following surviving claims:

    1) Defendants Dr. Funk, Dr. Vade, Bulatovic, Mote, Paul, Smith, Livingston, Hendrickson, Wiles, Kennedy, Hobart and Shaw violated the Eighth Amendment when they ignored or delayed treatment for the plaintiff's serous medical condition.

    2) Defendant Dr. Funk retaliated against the plaintiff in violation of the First Amendment when he ignored or delayed care for the plaintiff's medical condition due to numerous grievances filed by the plaintiff.

    3) Defendant Hendrickson violated the plaintiff's Eighth Amendment rights when he confiscated the plaintiff's prescribed stool softener after surgery causing the plaintiff increased pain.

    4) Defendant Joyal violated the plaintiff's Eighth and Fourteenth Amendment rights when he conducted a rectal examination of the plaintiff in view of other inmates and correctional officers.

All claims are against the defendants in their individual capacities.

The plaintiff alleges that he suffered from severe internal and rectal pain, but staff and doctors intentionally ignored his symptoms for months until he was finally allowed to have surgery for an anal fistula in November of 2003.

The court notes that the defendants do not define "fistula" in their initial motion for summary judgement. Stedman's Medical Dictionary defines a fistula as an abnormal passage from one epithelial surface to another epithelial surface and an "anal fistula" is defined as a fistula opening at or near the anus. *Stedman's Medical Dictionary* 149930 (27th ed.2000).

The defendants have filed motions for summary judgement. The plaintiff has filed numerous responses and the defendants have filed replies.

## II. FACTS

The following facts are taken from the defendants statement of undisputed facts, the plaintiff's response and the attached exhibits.          .

Defendant Bulatovic says he was the acting Medical Director at Pontiac Correctional Center from February 14, 2003 to July 28, 2003. During that time, he did not see the plaintiff as a patient. When the plaintiff made a request to be seen at the health care unit, he was referred to a medical technician. Therefore, Bulatovic says he personally did not evaluate the plaintiff for any medical condition nor was he involved in deciding what medical care the plaintiff should receive. Bulatovic says he may have responded to any grievances or correspondence the plaintiff sent to the medical department during the time he was acting Medical Director. However, the only letter Bulatovic is aware of is dated July 21, 2003 in which he responds to the plaintiff's concerns about hemorrhoids. Bulatovic tells the plaintiff he must either direct medical concerns to the cell house CMT to evaluate what treatment is needed or the plaintiff could send in a medical request slip.

Defendant Stephen Mote says he is the warden at Pontiac Correctional Center which houses over 1500 inmates. Mote says he is not a licensed medical professional and has no medical training. Correctional Officers Paul, Smith, Livingston, Hendrickson, Wiles, Kennedy, Hobart and Shaw all state they are also not medical professionals and have no authority to authorize or deny medical treatment to an inmate. All deny ever refusing medical treatment for the plaintiff.

The medical records at Pontiac Correctional Center show that the plaintiff was seen by medical personnel in the Health Care Unit 13 times from June 16, 2003 to November 13, 2003. However, the plaintiff says medical staff ignored his symptoms. The plaintiff says he filed numerous grievances, sent letters and made numerous requests for medical care but his condition was ignored. The following events are listed in chronological order:

**June 17, 2003 Medical exam:** Dr. Vade was working as a staff physician during the relevant time frames of the plaintiff's complaint. Dr. Vade says he first saw the plaintiff on June 17,

2003. During that visit, the plaintiff stated he was having problems with his bowel movements and did not believe he had a bowel movement in four days. Dr. Vade claims the plaintiff did not want to be examined. Dr. Vade believed the plaintiff was constipated and encouraged the plaintiff to increase fluids and physical activity. Dr. Vade also prescribed a laxative for the plaintiff. The plaintiff says he did not refuse any physical examination and states that Dr. Vade told him an exam was not necessary.

**August 3, 2003 Grievance**: The plaintiff writes that he has been suffering with bowel pain for the last month and a half. The plaintiff states he has seen medical staff, but they just tell him to drink more water. The plaintiff says he has noticed blood in the toilet and has a discovered an unusual hole near his rectum. The plaintiff says it discharges pus and fluids and is very painful. The plaintiff repeats that he is in severe pain and can not sleep or lay down. The grievance was forwarded to the Medical Director who told the plaintiff the procedures to get medical assistance.

**August 19, 2003 Medical Exam:** The plaintiff saw Dr. Vade again on this day. The plaintiff stated he had a red-green discharge from his rectum and complained of itching. The doctor asked the plaintiff about any sexual activity and the plaintiff denied participating in this conduct. Dr. Vade examined the plaintiff and found "the patient's appearance was within normal limits." (Def Mot, Vade Aff, p. 2) The plaintiff did have a hemorrhoid, but no discharge was noted. Dr. Vade educated the plaintiff about sexually transmitted diseases and advised him to follow up if he noted any further discharge.

**August 23, 2003 grievance:** The plaintiff again states he has a hole in near his rectum and has noticed a discharge. The plaintiff states he is in pain and needs medical care. The plaintiff says he has seen Dr. Vade, but claims the doctor never took the time to see the hole the plaintiff told him about. The grievance was refereed to the medical department.

**Medical Director response:** Dr. Funk was the Medical Director at Pontiac Correctional Center from June, 2003 through December of 2005. The first time he says the plaintiff wrote to him was in August of 2003 concerning the discharge from his rectum and the care he received. Dr. Funk says he reviewed the plaintiff's medical records for his most recent care and responded to the plaintiff. Dr. Funk wrote a letter to the plaintiff on August 27, 2003 telling the plaintiff that a rectal examination was the appropriate examination for the symptoms the plaintiff complained of. The plaintiff was also advised that a rectal examination could not be performed without the patient's cooperation. Dr. Funk told the plaintiff he could be reevaluated at sick call and reminded him how to obtain medical care at the institution. Dr. Funk did not provide any direct care to the plaintiff on this occasion.

**August 28, 2003 grievance:** This grievance is written in the form of a letter to Warden Mote asking for help for his medical condition. It is not clear if the document was received.

**September 9, 2003 grievance:** The plaintiff says he has shown the grievance counselor the blood and puss that he is suffering with and still cannot get medical care. The plaintiff again

repeats his medical problems and asks for care.

**September 21, 2003 grievance:** The plaintiff again asks for medical treatment for the hole near his rectum and says the pain is "unexplainable." (Plain. Resp., Ex 10) The plaintiff says "it feels like my intestine is coming out of my body." *Id.*

**September 23, 2003 letter:** The plaintiff sends a letter to Dr. Funk again complaining about his medical condition and the pain he is in. The plaintiff's letter includes a diagram illustrating the hole near his rectum.

**Medical Director response:** Dr. Funk responded with a letter to the plaintiff on September 25, 2003, telling the plaintiff he would be scheduled for the medical director clinic within the next two weeks.

**September 28, 2003 letter:** The plaintiff sends a letter to his grievance counselor again telling of his medical problem.

**September 30, 2003 Medical Exam**: Dr. Vade says the plaintiff stated he believed he had some kind of hole inside of him which he believed was in his intestine. The plaintiff again complained of a discharge from his rectum. Dr. Vade examined the plaintiff and noted that he "appeared to be within normal limits with the exception of a small area near his anus which was red in color." (Def. Memo, Vade Aff, p. 2) The doctor observed no discharge. Dr. Vade noted that the plaintiff had previously been prescribed penicillin and pain pills. Dr. Vade says the plaintiff was then "provided educational information regarding his condition." *Id.*

**September 30, 2003 Grievance:** The plaintiff says he met with Dr. Vade and told him about the hole near his rectum and his belief that he also had a hole now internally near his intestine. He says the doctor said this could not be true and asked the plaintiff if he was gay. The plaintiff denied any sexual activity and showed the doctor the letter he had written to Dr. Funk with the diagram of his problem. The plaintiff also showed Dr. Funk the external hole near his rectum, but the doctor told him it was a "superficial" hole and not that bad. (Plain. Memo, Ex 15) The plaintiff says officers in the room during his examination laughed at him.

**October 1, 2003 Medical Exam:** Dr. Funk saw the plaintiff in the medical director's clinic. Dr.Funk states that the plaintiff was complaining about a hole in his rectum. He indicated that he had difficulties going to the bathroom, had a discharge and pain. Dr. Funk examined the plaintiff and noted a "small inflamed hemorrhoidal tag." (Def. Memo, Funk Aff, p. 2). The plaintiff also complained of pain during the examination. The doctor noted that there were no masses and no discharge. The doctor specifically noted there was no fistula or hole near the rectum. The doctor noted that the plaintiff's weight had increased from previous visits.

Dr. Funk says he diagnosed the plaintiff as "having a small, inflamed hemorrhoid who likely also had an anal fissure." (Def Memo, Funk Aff, p. 3) Dr. Funk prescribed an antibiotic, a hemorrhoidal suppository, an Anusol cream, and a laxative. The doctor advised the plaintiff to

increase his water intake and provided him information concerning his condition.

The plaintiff claims Dr. Funk performed only a fast examination on October 1, 2003, and never gave him information about his condition or told him to drink water. Instead, the plaintiff maintains that Dr. Funk told him to stop filing grievances and complaining about his care.

**November 5, 2004 Medical Exam:** Dr. Funk saw the plaintiff again in the medical director clinic for a follow up examination. The plaintiff still complained of a discharge and said the pain had increased during bowel movements. Dr. Funk again examined the plaintiff and reviewed his history. Dr. Funk says his "assessment at that point was the patient had a chronically infected perianal abscess or a perianal rectal fistula not responding to conservative treatment." *Id.* Dr. Funk changed the plaintiff's prescription and recommended a surgery referral. Dr. Funk says in informed the plaintiff of the treatment plan and that he would be housed in the infirmary.

**November 7, 2003 Medical Exam:** The plaintiff was scheduled for another examination with Dr. Funk on November 7, 2003. Dr. Funk says he obtained pre-operative history and performed a physical. The information was then provided to the surgeon, Dr. Drennan. Dr. Funk says his "plan at the time was to schedule the patient to be seen again on November 10, 2003 for tests including blood work, PA and lateral chest x-rays, and EKG and urinalysis as part of a pre-operative work up." (Def. Memo, Funk Aff. P. 4). However, the plaintiff did not show up for his scheduled EKG on November 10, 2003.

The plaintiff maintains he never refused to show for any testing because he was never told about any planned testing.

**November 10-13 Medical consultations:** Dr. Funk says he discussed the case with the surgeon, Dr. Drennan, on November 10, 2003. Dr. Drennan requested that the plaintiff receive a pre-operative bowel preparation called "Go-Lytely" and scheduled the plaintiff's surgery for November 18, 2003. *Id.* at 5. Dr. Funk says after the conversation, he wrote medical orders asking for: 1) the plaintiff to be admitted to the infirmary on November 16, 2003; 2) placing the plaintiff on a clear, liquid diet beginning November 17, 2003; 3) beginning the Go-Lytely preparation on November 17, 2003 and process the paperwork in order to obtain the Go-Lytely.

Dr. Funk says he received a call from Dr. Drennan's office on November 13, 2003, stating that the procedure needed to be moved to November 19, 2003. Dr. Funk says he rewrote his medical orders to comply with this request and prepare the plaintiff for surgery. Dr. Funks the medical records indicate his orders were followed

**November 18, 2003 Medical Exam:** The plaintiff saw Dr. Vade on this day for "pre-operative preparation." (Def. Memo, Vade Aff, p. 2) The plaintiff was scheduled for a colonoscopy with possible fistula repair. Dr. Vade says he discussed the surgery with the plaintiff, what he could expect and the importance of the plaintiff complying with care requirements before and after his surgery. The plaintiff stated that he understood and Dr. Vade provided him with additional information on the surgery.

**November 19, 2003, Surgery:** The plaintiff was admitted to Passavant Area Hospital on November 19, 2003 were surgery was performed to repair a rectal fistula. Dr. Drennan's medical record indicates the plaintiff had an "obvious fistula." (Plain. Resp, Ex. 18)

**November 23, 2003 Medical Exam:** Dr. Vade examined the plaintiff and noted that he appeared to be within normal limits at the operation site. There was no bleeding or discharge noted. Dr. Vade told the plaintiff to continue with his present treatment. The plaintiff was discharged from the healthcare unit on November 24, 2003.

**November 24, 2004:** The plaintiff brought a stool softener back to his cell. Officer Hendrickson says he "confiscated the items for review due to security concerns regarding the applicator." (Def. Memo, Hendrickson Aff, p. 2) The officer does not state whether he spoke to anyone in the medical department.

**November 24, 2004 Grievance:** The plaintiff says the stool softener was prescribed by Dr. Drennan to decrease the pain and swelling following surgery. The plaintiff says it had been approved by medical staff and even the guards who escorted him back to his cell. The plaintiff says these guards told Officer Hendrickson the stool softener was prescribed for the plaintiff. The plaintiff says Officer Hendrickson made several derogatory comments about his surgery and medical condition before taking the stool softener.

**December 2, 2003 Medical Exam:** The plaintiff was seen in the healthcare unit due to his complaints of rectal pain. Medical Technician Joyal says he attempted to perform a rectal examination of the plaintiff in the sick call room. Joyal says the door was slightly open and positioned so security staff could maintain visual oversight of the plaintiff, but were not able to see the examination. Joyal says no other inmates could see in the examination area. Joyal maintains that the location and conditions of the examination were within the policies and procedures normally followed at Pontiac Correctional Center. However, the plaintiff refused the examination and was returned to his cell. (Def. Memo, Joyal Aff.)

**December 2, 2003 Grievance:** The plaintiff says Dr. Vade actually lead the examination on this day and was assisted by Medical Technician Joyal. The plaintiff says as Dr. Vade was about to exam him, the plaintiff saw the door was open and two guards and two inmates were looking at him. The plaintiff asked if the door could be closed. Dr. Vade told Joyal to "pull the door" and the door was closed slightly, but the plaintiff says he could still see the guards and inmates and they were looking at him. (Plain Resp, Ex. 21). The plaintiff asked them to close the door all the way. Defendant Joyal told the plaintiff to stop complaining and stop worrying about people looking at him and let the doctor do his job. The plaintiff said he needed the examination, but thought he had a right to some privacy. Defendant Joyal then asked the plaintiff if he was going to cooperate or not, because they had other people to see. Apparently, the plaintiff decided not to cooperate with the examination.

**December 20, 2003 Medical Exam:** The plaintiff went to the health care unit on this day. Dr. Vade spoke with the plaintiff who stated that he was bleeding often, but refused to be examined.

6

Instead, he asked for Preparation H. Dr. Vade says since the plaintiff refused, no examination was done. The doctor provided the plaintiff with more information about his condition and advised him to come back to the healthcare unit if he had further problems.

**February 5 and 8, 2004 Medical Exam:** The plaintiff was seen by medical staff for complaints about rectal pain and he was referred to sick call. On February 8, 2004, the plaintiff was seen during sick call concerning rectal pain and bleeding. Medical staff noted that the plaintiff did not appear to be in distress. The plaintiff was given Tylenol and suppositories.

**March 3, 2004 Medical Exam:** Dr. Funk next saw the plaintiff in the medical director clinic. The plaintiff complained of pain with bowel movements. The plaintiff also said he sometimes suffered from constipation and saw blood. Dr. Funk examined the plaintiff and found three "erthematous bloody hemorrhoids." (Def. Memo, Funk Aff, p. 6)

**March 9, 2003 Medical Exam:** Dr. Funk observed no fistula and instead diagnosed the plaintiff with "post-fistula repair with hemorrhoids and some occasional bleeding." *Id.* Dr. Funk ordered Fiberlax tablets for the plaintiff and Preparation H. Dr. Funk also directed the plaintiff to increase his water intake and he explained the treatment to the plaintiff.

**Transfer:** Dr. Funk says he reviewed the plaintiff's medical chart on April 29, 2004 to see if he could be transferred. Dr. Funk says there were no procedures pending and the transfer was allowed. The plaintiff was then moved to another correctional facility in April of 2004.

On May 5, 2004, the plaintiff was screened at the Western Illinois Correctional Center. The plaintiff was seen by a nurse and denied any medical health concerns.

Dr. Vade says in his medical opinion, the plaintiff was treated appropriately for his medical conditions, and he does not believe that the plaintiff suffered from any substantial risk of harm at any time. "On those occasions that Mr. Thomas (the plaintiff) made specific complaints but refused to be examined, there as nothing I could do for him other than provide him with information as it is not appropriate for me to prescribe medication or other treatment when the patient refuses an examination." (Def. Memo, Vade Aff, p. 4) In addition, Dr. Vade states that to the extent the plaintiff suffered from hemorrhoids "subsequent to the repair of his fistula, this is a common condition which can and was treated conservatively." *Id.*

Dr. Funk states that the plaintiff was initially treated for hemorrhoids which are a common problem that can be treated with conservative measures like laxatives and hydrocortisone creams. Dr. Funk says in his medical opinion the plaintiff was treated appropriately for the complaints that he made to medical staff. Dr. Funk says:

> it was appropriate to address the plaintiff's complaints conservatively in an effort to avoid the need for more complicated medical procedures which may have been unnecessary and could have posed significant risks to the patients health. (Def. Memo, Funk Aff, p. 7)

Dr. Funk says after the conservative treatment was not successful, the plaintiff was referred to a surgeon for further assessment and treatment. "At no time was Mr. Thomas (the plaintiff) at risk of substantial harm with respect to these medical complaints." *Id.*

### III. LEGAL STANDARD

The entry of summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the nonmoving party. Id.

A party moving for summary judgment initially has the burden of showing the absence of any genuine dispute of material fact based on the evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153 (1970); *Schroeder v. Barth, Inc.,* 969 F.2d 421, 423 (7th Cir. 1992). A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Nonetheless, "(s)ummary judgement is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgement must be granted." *Jones v. Johnson*, 26 F.3d 727, 728 (7th Cir. 1994).

### IV. ANALYSIS

A. DELIBERATE INDIFFERENCE TO A MEDICAL NEED.

Defendants Dr. Funk, Dr. Vade and Dr. Bulatovic state that the plaintiff can not demonstrate that the were deliberately indifferent to his medical needs. The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The plaintiff must first demonstrate that the alleged deprivation was sufficiently serious. *Id*. The plaintiff must also show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

"[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

"[P]roof of deliberate indifference may be found where a prison official intentionally

8

denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha*, 151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6. A delay in scheduling an appointment for medical treatment may constitute deliberate indifference. *Jones v. Simek*, 193 F.3d 485, 490-491 (7th Cir. 1999) However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The medical defendants first argue that they do not dispute that the plaintiff suffered from hemorrhoids which produced pain and bleeding. They state that each time the plaintiff complained, he was "appropriately assessed by a physician who made recommendations to treat his condition and symptoms." (Def. Memo, p. 14-15). The defendants also argue there was no delay in his treatment and he received surgery when the doctors found that it was necessary. The defendants state that the plaintiff is merely dissatisfied with the treatment he received. He cannot demonstrate that the medical staff knew of and disregarded an excessive risk to his health and safety. In addition, the defendants state that medical decisions about what treatment is preferable to another are beyond the Eighth Amendment's purview.

It is definitely true that the plaintiff did repeatedly see medical staff. However, what is initially difficult to understand is how the plaintiff first reported an unusual opening near his rectum on August 3, 2003 and even drew a diagram of this opening on September 23, 2003, but no doctors were able to detect this abnormality. It seems to support the plaintiff's claim that the doctors reused to thoroughly exam him. And there is also the troublesome medical note by his surgeon that the "external fistula orifice was obvious." (Def. Reply, Ex. C)

In their reply to the plaintiff's response, the medical defendants provide more pertinent information. In response to the court-directed discovery requests, the defendants were asked what condition led to the plaintiff's surgery. *See* July 28, 2006 Court Order. The defendants reply that the plaintiff had a perianal fistula..

> The appearance of a fistula is a dimpling in the skin indicating an opening of the fistula. The diameter of Mr. Thomas' (the plaintiff's) fistula was recorded as 1-2 mm (approximately 1/32 of an inch.)(Def. Reply, Ex. A, p. 2)

The defendants also state that the length of the plaintiff's fistula was approximately ½ inch.
> Fistulas vary in size. Mr. Thomas' fistula was extremely small compared to fistulas in general or other rectal fistulas. Symptoms of an inflamed hemorrhoid are similar to those caused by a fistula and Mr. Thomas had a hemorrhoid in the same area that obscured visualization of the fistula. Mr. Thomas' symptoms were more consistent with an inflamed hemorrhoid and he was provided with treatment for this until a fistula was recognized. (Def. Reply, Ex. A., p. 2-3)

The medical staff also point out that none of them ever observed any discharge that could indicate a fistula instead of hemorrhoids.

9

The defendants state that fistulas typically result in an abnormal discharge and some patients may complain of swelling, but they are not painful and some may produce no symptoms. "When a fistula is caused by an abscess, pain, swelling and discharge are present and resolve over a period of a few days." (Def. Reply, Ex. A, p. 3). The defendants claim that fistulas do not worsen if left untreated and symptoms generally resolve without repair. The defendants further state that surgery for a perirectal fistual is an elective procedure.

> "Mr. Thomas elected to have surgery and this was scheduled and completed.
> Surgery was completed in a few minutes and repaired with a single stitch.
> (Def. Reply, Ex.A, p. 3)

It appears the plaintiff was in some pain on the day he saw the surgeon since the doctor noted that he was too tender to examine prior to the operation. (Def. Reply, Ex. C).

While it is troublesome that no doctor was able to detect the perirectal fistula even though the plaintiff clearly complained of an unusual hole near his rectum, the court cannot say that the plaintiff has demonstrated that the defendants were deliberately indifferent to his medical condition. The first time the plaintiff obviously complained about something other than hemorrhoids was on August 3, 2003. The plaintiff was examined on August 19, September 30, October 1 and November 5 of 2003. On each of these days, there is no dispute that the doctors did perform a rectal examination of the plaintiff. On November 5, 2003, Dr. Funk decided to recommend a surgical referral. The plaintiff was again examined on November 7 and November 18 of 2003 and his surgery was performed on November 19, 2003. Lastly, when the plaintiff was eventually transferred to a new facility, he indicated he had no medical conditions.

While the plaintiff maintains the defendants did not examine him thoroughly enough, he has not demonstrated that they knew he had a perirectal fistual and refused to treat him. Even if the doctors did not make the right decisions, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997).

The court also notes that there is no evidence that Medical Director Dr. Bulatovic was involved with the plaintiff's care during the relevant time periods. Defendant Bulatovic was Medical Director from February 14, 2003 to July 28, 2003. There is no indication the plaintiff complained of an unusual hole near his rectum until August of 2003. There is also no indication that Dr. Bulatovic ever personally examined the plaintiff.

Lastly, the court notes that the plaintiff has not demonstrated that Defendants Mote, Paul, Smith, Livingston, Hendrickson, Wiles, Kennedy, Hobart or Shaw were deliberately indifferent to his medical condition. None of these defendants has any medical training or expertise. "When the defendants are not themselves physicians or other trained medical practitioners, deference to the advice or treatment of a physician generally will not constitute deliberate indifference." *Stokes v Sood,* 2001 WL 1518529 at 3 (N.D.Ill. 2001); *See also McEachern v. Civiletti*, 502 F.Supp. 532, 534 (N.D.Ill.1980) The plaintiff was repeatedly seen by medical care and his

10

grievances demonstrate that his concerns were not ignored, but were forwarded to the medical staff. The motion for summary judgement on the plaintiff's claim that the defendants were deliberately indifferent to his serious medical condition is granted.

B. RETALIATION

Dr. Funk argues that the plaintiff cannot demonstrate that he retaliated against the plaintiff in violation of his First Amendment rights. Although it is easy to state a retaliation claim, the burden of proving the claim is heavy. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *see also Cole v Litscher*, 2005 WL 627791 (W.D. Wis. March 15, 2005). A prisoner must prove that his constitutionally protected conduct was a substantial or motivating factor in a defendant's actions. *Spiegla v. Hull*, 371 F.3d 928, 942-43 (7th Cir. 2004) Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct. *Id.* at 943. Therefore, if a prison officer's actions are supported by legitimate penological concerns, the retaliation claim fails as a matter of law.

The defendants argue that the plaintiff cannot claim that the medical care he received was the result of his grievances, because the grievances are about the same care he received. "[A]n action cannot be the result of something that happens afterwards." (Def. Memo, p. 18). The defendants also state that anytime the plaintiff did file a grievance, he was provided medical care.

The court agrees that the plaintiff has failed to demonstrate that the defendants actions were motivated by retaliation. While the plaintiff did file numerous grievances, he did not initially file grievances against Dr. Funk. In addition, the plaintiff says Dr. Funk told him to stop filing grievances on October 1, 2003. However, on this same day, the doctor still scheduled him for a follow-up visit on November 5, 2003 and recommended that the plaintiff see a surgeon.

There is also no evidence the doctors would have treated the plaintiff any differently if he had not filed grievances. There is no evidence the doctors detected the perirectal fistula or believed the plaintiff suffered from a fistula until Dr. Funk recommended the plaintiff see a surgeon. The defendants' motion for summary judgement on the plaintiff's claim that Dr. Funk retaliated against him is granted.

C. DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL CONDITION- DEFENDANT HENDRICKSON.

Defendant Hendrickson argues that the plaintiff cannot demonstrate that he was deliberately indifferent to the plaintiff's serious medical needs when he confiscated the plaintiff's stool softener after surgery. Again, to show a violation of the Eighth Amendment, the plaintiff must demonstrate that the alleged deprivation was sufficiently serious and that the defendant acted with deliberate indifference. *Farmer,* 511 U.S. at 828. Deliberate indifference

"requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis*120 F.3d at 91.

Defendant Hendrickson says he noted that the stool softener the plaintiff brought with him to his cell contained an applicator. "I confiscated the items for review due to security concerns regarding the applicator." (Def. Memo, Hend. Aff, p. 2). Unfortunately, the defendant does not elaborate on why he thought the applicator was a potential security risk, nor does he state the result of the security "review."

The plaintiff admits Defendant Henrickson told him he was taking the applicator due to security concerns, but says Hendrickson made fun of him and knew that he had just returned from surgery and that the stool softener was prescribed for him. While the plaintiff did file a grievance against the defendant, the main gist of the plaintiff's grievance is that he was treated in a humiliating manner and he does not believe the defendant should have the ability to take a product that was prescribed by the medical department.

The plaintiff returned to his cell on November 24, 2003, but did not return to the health care unit until December 2, 2003. The plaintiff was again seen in the health care unit on December 20, 2003, and February 5, February 8 and March 9 of 2004. There is no indication the plaintiff made any requests or complaints concerning the stool softener during these visits. The plaintiff was transferred in April of 2004 and in May of 2004 reported no physical problems. While the actions of Defendant Henrickson as alleged by the plaintiff are not commendable, the court does not believe the action rises to the level of a constitutional violation.

D.  EXAMINATION BY JOYAL

Defendant Joyal argues that the plaintiff cannot demonstrate that he violated the plaintiff's Eighth and Fourteenth Amendment rights due to an alleged rectal examination of the plaintiff in view of other inmates and correctional officers. The defendants argue that plaintiff's claim against Defendant Joyal must fail because he has not alleged any physical injury. Under the Prison Litigation Reform Act, 42 U.S.C.§1997(e), no civil suit may be brought for mental or psychological injuries when there has been no prior showing that the inmate suffered a physical injury prior to suffering the mental or psychologial injury. *Evans v. Allen,* 981 F. Supp. 1102 (N.D.Ill. 1997).

The plaintiff alleges he did suffer damages because he was denied an examination and he continued to experience pain. The plaintiff does not deny that he refused the examination. The plaintiff may not be entitled to damages for mental or psychological injury, but it is possible that if the defendants violated his constitutional rights, he would be entitled to nominal damages. *See Armstrong v Drahos*, 2002 WL 187502 at 2. (N.D. Ill. Feb. 6, 2002); *Sperow v. Melvin*, No. 96-4219, 1999 WL 450786 at 1-2 (7th Cir. June 24, 1999).

To establish a violation of his Eighth Amendment rights, the plaintiff must demonstrate that he was subjected to conditions that constitute a "serious deprivation of basic human needs"

12

which are the "minimal civilized measure of life's necessities." *Rhodes v Chapman,* 452 U.S. 337, 347 (1981). In addition, the plaintiff must show that the defendant acted with deliberate indifference to the risk of harm. *Farmer,* 511 U.S. 825. More specifically, "[t]o establish a claim of medical mistreatment in violation of the Eighth Amendment, plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference by prison personnel to his serious medical needs." *Vergara v. Vogliano*, 1997 WL 86388 at 4 (S.D.N.Y. 1997) *citing Estelle v Gamble,* 429 U.S. 97 (1976). Similarly, to determine whether the plaintiff's Fourteenth Amendment substantive due process rights were violated, plaintiff must show the defendant's behavior was "so egregious, so outrageous, that it may fairly be said to shock the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 848 N. 8 (1998).

The plaintiff alleges that on December 2, 2003, he requested medical care. The plaintiff says as Dr. Vade began the rectal exam, the plaintiff noticed the door was open and guards and other inmates could see in. The plaintiff asked the doctor to close the door, and Dr. Vade instructed the assisting medical technician, Defendant Joyal, to "pull the door." (Plain. Memo, Dec. 2, 2003 Grievance.) The door was not closed completely and the plaintiff claims the officers and two inmates could still see in. He claims Defendant Joyal told him to stop complaining and let the doctor exam him. The plaintiff continued to ask for privacy and Defendant Joyal asked the plaintiff if he was going to allow the examination or not because they had other people to see. The plaintiff refused the examination.

The defendants disagree with the plaintiff's rendition of the events and state that no inmates could see into the examination room. Defendant Joyal says the door was slightly open and positioned so security staff could maintain visual oversight of the plaintiff, but the officers were not able to see the examination. Joyal also maintains that the location and conditions of the examination were within the policies and procedures normally followed at Pontiac Correctional Center. (Def. Memo, Joyal Aff.).

A few courts have dealt with similar situations. In *Vergara v. Vogliano*, 1997 WL 86388 at 4 (S.D.N.Y. 1997) *,* a pretrial detainee signed up for sick call to received prescribed treatment for venereal warts. The treating doctor spoke about the plaintiff's condition within the earshot of several correctional officers. The doctor told the plaintiff to take his pants down for an examination. The plaintiff asked that a privacy curtain be pulled, but the doctor refused and told the plaintiff there were more people to see and he did not have all day. The plaintiff asked if he could take the ointment and apply it on his own. The request was denied and the plaintiff refused treatment.

The court found that the "[p]laintiff's prisoner status allows for security concerns to outweigh his privacy rights. Plaintiff is not entitled to receive medical treatment in complete privacy. The fact that plaintiff refused the proffered treatment unless (the doctor) closed the curtain does not evidence deliberate indifference to medical needs." *Id.*

In *Rodriguez v. Ames,* 287 F.Supp.2d 213 (W.D.N.Y. 2003), a prisoner requested testing for a bowel condition. A doctor came to the plaintiff's cell and asked the plaintiff to cooperate

with a rectal examination. The plaintiff protested to an examination in his cell with his cell mate present. The doctor said if the plaintiff did not comply, he would mark it in the medical record as a refusal to have an examination. The plaintiff complied and the doctor performed a brief visual examination. Both the plaintiff's cell mate and a male nurse were present. The court found that the examination did not violate either the Eighth or Fourteenth Amendments and reiterated that the plaintiff did not have a right to receive medical care in total privacy.

While it is troubling in the case before the court that the plaintiff alleges that two inmates could see into the examination room, the court does not believe the violation alleged reaches constitutional proportions. The motion for summary judgment is also allowed as to this claim.

### V. CONCLUSION.

Defendants Funk, Vade and Bulatovic's motion for summary judgement is granted. [d/e 111]. Defendants Smith Livingson, Henrickson, Wiles, Kennedy, Hobart, Shaw, Mote, Joyal and Paul's motion for summary judgement is also granted. [d/e 113]

**ITS IS THEREFORE ORDERED that:**

**1) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 111, 113]   The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order. The parties are to bear their own costs. This case is terminated.**

**2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. See Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**3) The agency having custody of the plaintiff is directed to remit the docketing fee of $150.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $150.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $150.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $150.00.**

**4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change. Release from incarceration does not**

**relieve the plaintiff of his obligation to pay the filing fee in full.**

**5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this _23rd__ day of March, 2007.

                              s\Harold A. Baker
           _____
                           HAROLD A. BAKER
                     UNITED STATES DISTRICT JUDGE